**REVENUE CABINET COMMONWEALTH OF KENTUCKY,**
Appellant,

v.

**ARMCO, INC., Appellee.**

**No. 91–CA–1015–MR.**

Court of Appeals of Kentucky.

March 27, 1992.

Discretionary Review Denied by Supreme Court Nov. 11, 1992.

Celia M. Dunlap, Frankfort, for appellant.

Irwin G. Waterman, Robert V. Waterman, Morris, Garlove, Waterman & Johnson, Louisville, James D. Ryan, Armco Inc., General Offices, Middletown, Ohio, William H. Jones, Jr., Vanantwerp, Monge, Jones & Edwards, Ashland, for appellee.

Before LESTER, C.J., and JOHNSON and MILLER, JJ.

LESTER, Chief Judge.

This is an appeal from a judgment supported by findings of fact and conclusions of law reversing an order of the Board of Tax Appeals concerning sales and use taxes assessed against appellee.

In 1981 Armco embarked on a new manufacturing venture, namely, the fabrication of blooms which are lengths of steel with cross-sections of from 14″ to 16″ poured from molten steel. In order to make blooms, it is first necessary to acquire and construct a bloom caster which is enclosed in a structure which Armco says is the size of a football field but, based on an aerial photograph in the record, appears to be much larger than the average gridiron. Some parts of the caster are made in the United States while other components are fabricated by foreign manufacturers. In this case, the supplier was Mannesmann Demag which has hundreds of machines in operation, but it must be emphasized that virtually no two are alike because each purchaser formulates its own specifications to suit its particular purposes. This creates the problem that spare or replacement parts may also be unique to a given caster and can take from eight to eighteen months to obtain.

To fully understand the taxation problem, we must first discuss what in the industry is referred to as "infant mortality." This concept is best described by the testimony of record, the first of which was given by the appellee's manager of engineering maintenance and services:

Q  Now, did you participate in the authorization of the purchase of the first spares which are listed on Exhibit 11, the ladle turret, the tundish, the tundish slide gate and the others?

A  Yes, I did.

Q  And would you give the reason why Armco authorized and purchased those additional components?

A  Yes.

First of all, I think we probably should discuss how first spares are arrived at. When you buy a machine such as this, the vendor of that machine, who is a world-wide supplier of machines, in this case Mannesmann Demag, they have many hundreds of these machines in operation.

So based upon their past history, they know what we, as a new owner, are likely to have problems with. They will give us a list of spares.

In this case, they broke them into a phase one, phase two list, of items that they feel that you absolutely have to have on hand in order to start that machine up, items from their past experience that they feel are most susceptible to failure.

Failure can come about in many ways. Failure can come about due to what we refer to as infant mortality, you plug a new electronic device in and it fails immediately due to some mismanufacture. There is a curve that we often look at on failure rates which shows failure rates on a vertical axis versus time on a horizontal axis as you will find failures on new equipment there is a very high rate

to start with. And if the device runs for 2 weeks or 3 weeks, the incident of failure is much less likely to occur.

So we cover ourselves first for infant mortality. We cover ourselves for any sort of a device that might fail that would jeopardize the safety of our work force, an interlock disconnect switch or something like this that might fail.

The third thing we try to do is to look at pieces of equipment that if they fail, we would not be able to schedule the operation. In other words, it would be shut down on an unplanned basis.

These devices fall into a couple of different categories. In this instance, we had to buy some of these devices because they were foreign manufacturer and it would take a long time to get. The other reason for failure is that for buying these is that some of these items perhaps made in the United States are one of a kind items. And we have to buy those because if we waited until we had a failure and then ordered them, we could be as much as 8 to 10 months in receiving them.

During that period of time, we would have the machinery out of operation.

So for all of those reasons, we buy what we call here first spares. And that is indeed what's on this list.

Q You stated that the items are unique but you also stated that the contact, the manufacturer, had a number of these around the world, a couple of these installations around the world?

A Yeah.

Q Would the tundish slide gate at Armco be the same as a tundish slide gate at U.S. Steel in Pittsburgh?

A It could be.

Q Is it likely?

A No, it is not likely.

We often try to cross-reference other devices. We also do a risk analysis here. And, for instance, on this particular machine, we have a very large transformer, very, very expensive to buy, not of United States manufacture.

We did not want to spend our money on that if we could avoid that. We found that U.S. Steel in Fairfield had one of these. And we made an arrangement whereby we could try to get each other out of trouble, if you will, send a spare if we could do that. We always make that attempt. It's a risk analysis.

But in most all instances, the machines, although they are made by the same company, are greatly varied in the details of design, either due to the specification that the company would make on the availability of devices that the machine manufacturer would find.

Q Armco makes its own specifications for the machine?

A That is correct.

Q And—

A As do all others.

In addition to the foregoing, we note the evidence of a consulting engineer, Mr. William Leslie Robinson, whose professional credentials are most extensive, to the effect:

Q Now, from your professional experience and your examination of the bloom caster schematic drawing, and your personal investigation of the history of the bloom caster at the Ashland Works, have you an opinion, based on a reasonable degree engineering certainty, as to whether this—whether the purchase—purchases of the first spares listed on Exhibit 11 about which you have given testimony, were an engineering necessity?

A I have.

Q And what is that opinion?

A That they were of vital necessity.

Q From your professional experience and your examination of the bloom caster schematic drawing and your personal investigation of the history of the bloom caster, have you an opinion, based on a reasonable degree engineering certainty, as to whether the purchases of the first spares listed on Exhibit 11 about which you have given testimony, were a production and business necessity?

A I have.

Q What is that opinion?

A That they were.

Q Will you explain your reasons for your answer concerning the engineering necessity?

A Basically from the installation and commissioning of a new facility, there are usually problems associated inasmuch as a facility in toto cannot be tested by the fabricator or the mill builder. So inevitably one finds problems in a complex facility such as the caster. That is one reason why spares are of—must be on hand.

Another is that failure of any of the major components involves a shut down of the facility. And that, of course, is certainly not what is desirable.

Also without the addition of availability of immediate replacement of spares, there might be a temptation on the part of the longbreakers to run the mill in an unsafe matter. So upon the safety of personnel, one must have spares on hand.

And in some cases, the spares are necessary because the spares are used alternately or in a sequence. For example, a tundish must periodically be realigned and so during the realigning, another tundish must be available, otherwise the caster is shut down and so on.

So spares are absolutely necessary, not only to maintain the operation of the facility, but for good economic reasons and also for safety reasons and so on.

Q What would be the effect on the— what would be the effect on the utilization of the continuous bloom caster if one of those major components listed on the schedule of first spares, say the torch approach table, dummy bar disconnect, were to become non-functional?

A In that case, one would have to shut off the slide gate associated with that and discontinue the operation, the production of this strand.

Q And if there were not a first spare available, what would be the production time for replacement?

A That depends upon the components. But inasmuch as some of the components were manufactured overseas and would have to be, in a sense, specially made for that facility since they are not off the shelf items, it may take many months.

Q Can you give us a range of months?

A It could be, I think, up to 12 to 18 months delay, for example, if one required a major item like the tundish or something of that nature.

Thus, we see that to make the bloom caster functional immediately after installation, the original or first spare parts are essential to even the initial testing of the facility.

The testimony recounted above must be considered in light of the argument surrounding the availability of the manufacturer's warranty with or without the first spares. In its brief appellant maintains "[t]he purchase of repair parts as first spares did not affect any warranty covering the bloom caster" and relies upon the following to support its position as elicited from the castor manufacturer's project coordination manager:

Q Do you require the customer to buy these first spares from you when the purchase the bloom caster?

A We always give them a list.

Otherwise, if we are warranty that like, for instance, we guarantee in our case, we guaranteeing this production rate and we are guaranteeing this quality. So we always say we will these are we give them a list, we have a comprehensive list. Out of that, those items I wish I had brought that for the current slab caster. It is marked very clearly that these must be purchased.

Q Is this an extended warranty you are talking about?

A I do not know that you mean by extended warranty.

Q You testified that there is a merchandise or a manufacturing defect?

A Yeah.

Q I would presume that this warranty you are talking about is second warranty to guarantee up time, you are guaranteeing performance of a certain performance?

A Yes.

Q On the bloom caster?

A Certainly.

Q Does the customer pay for more for that?

A In the course of buying the spares, they have to buy the spares for that.

Appellee, for its argument to the contrary, not only also relies upon the foregoing but in addition on the following (evidence of David Alexander, manager, engineering services for Armco):

Q Could you elaborate on that, if you will, and explain your answer in a little greater than you gave earlier concerning the requirement of the vendor, spares be purchased, if the machinery is guaranteed by the purchase contract?

A If you sign a contract with a vendor for a device and as part of your purchase agreement you told that vendor that not only was he to supply a machine to you, but he was to guarantee that that machine would make a particular product of a particular quality for a particular period of time, then when he quoted you the price of that machine, he, himself, would interject into his purchase his supply sufficient spares to cause that period of time to be sustained without loss of production.

Q Could you obtain the guarantee described without purchasing the spares required by the vendor to?

A No, no. Not short of some special arrangement.

As to the issues surrounding the taxability, the Board contented itself with saying:

First spares purchased by Armco are repair parts and are subject to sales and use tax

and

... that first spares fail to meet the requirement for exemption as machinery for new and expanded industry. The Board comes to the conclusion that first spares are just as much replacement parts for machinery as are additional spare parts which are subject to sales and use tax.

The Boyd Circuit Court, on the other hand, elaborates in its findings and conclusions:

The evidence is quite clear in this case and uncontradicted that the company selling the equipment to Armco, Inc., would not warrant its operation or guarantee its operation unless Armco, Inc., purchased with the bloom caster spare parts which have been designated as "first spares" or "start up spares" but actually are parts which the company felt should be available to the purchaser. The manufacturer of the bloom caster has, in the past, had experience whereby these particular parts would fail in the initial operation of the bloom caster and in order to save downtime and to prevent any costly delay, would not sell the bloom caster without the spare parts which often failed in the initial operation. The Board disregarded this testimony and failed to apply the proper law.

\* \* \* \* \* \*

The Court finds that the Board failed to recognize the complete package doctrine whereby you do not get a warranty or guaranty unless you take the complete package. In some commercial fields you find what is called the "gray market", meaning you can purchase same and like products without warranties and if it works, OK. If it fails, it's your problem. If the caster failed to operate, the Revenue Cabinet loses indirectly from the income taxes that would not be paid to employees until the caster becomes operational. The "first spare" contemporaneously purchased with the bloom caster are conclusively an integral part of the purchase of the bloom caster itself.

■ We will first deal with the spare parts issue. Revenue Cabinet commences its argument speaking of the standard of a Board of Tax Appeals decision by urging "[i]n its June 21, 1991, Order the Board set forth specific and detailed findings of fact, Appendix A. Those findings were supported by substantial evidence." We examined Appendix A to appellant's brief as well as the order of the Board of record just to assure ourselves that we were not overlooking something, and we are unable to agree with appellant that the administrative agency "set forth specific and detailed findings of fact," nor did we note "substantial evidence" supporting what conclusions it did reach. For that matter, the substantial evidence all favors the taxpayer. We

cannot escape the fact that, on the issue of first spares, the Cabinet did not introduce one witness and it did little or nothing to bolster its cause upon cross-examination of Armco's witnesses. Pursuant to KRS 131.-370, the Court may dispose of an appeal from the Board contrary to the agency order if it is reached on non-conformity to the law or if the factual findings are not supported by the record. We now turn to the applicable law.

The General Assembly enacted KRS 139.-170 defining machinery for new and expanded industry which shall be exempted from sales and use taxes. Pursuant to KRS Chapter 13A, the appellant adopted 103 KAR 30:120 which provides, in part, in the first sentence of Section 1:

> The machinery *and the appurtenant equipment necessary to the completed installation* of such machinery, together with the materials directly used in the installation of such machinery *and appurtenant equipment,* which are incorporated for the first time into new or existing plant facilities, or which are installed in the place of existing plant machinery having a lesser productive capacity, and which are directly used in a manufacturing or processing production operation shall be exempt from the sales and use tax. (emphasis added).

The polestar which guides the courts in dealing with machinery and exemptions therefor in new industry is found in *Schenley Distillers, Inc. v. Commonwealth, ex rel. Luckett,* Ky., 467 S.W.2d 598, 601 (1971), when Commissioner Clay writing for a unanimous court pointed out:

> ... we also must take into consideration the objective of the legislature in creating particular exemptions to encourage the location and expansion of industries in Kentucky [1]

*Schenley Distillers* was followed by *Ross v. Greene & Webb Lumber Co., Inc.,* Ky., 567 S.W.2d 302, 304 (1978), where the Court remarked:

> It is obvious that the legislative intent in enacting the exemption statute was to enhance Kentucky's competitive position in manufacturing.

It is evident that the Revenue Cabinet supported the legislative policy for, when it adopted 103 KAR 30:120(1), it provided an exemption for the machinery "and the appurtenant equipment necessary to the *completed* installation" into a new plant facility. Taking the facts of this case and the law we have:

> A new industry—the manufacture of pipe components
>
> New machinery—a bloom caster
>
> Appurtenant equipment necessary for completed installation—extra parts to make the bloom caster operational initially or, in the language of the regulation, "completed installation."

We must keep in mind that these first spares were not to be utilized after others had worn out following installation of the caster but were those necessary to make it operational in the first instance. Armco readily admits that replacement bearing purchased after the machinery became productive were subject to the tax.

Our views, as well as those of the court below, are supported by *H and A Coal Co. v. Revenue Cabinet, Commonwealth,* reported under the lead decision of *Revenue Cabinet, Commonwealth v. Amax Coal Co.,* Ky., 718 S.W.2d 947 (1986). In *H and A Coal Co.,* the taxpayer bought an underground scoop powered by three complete sets of batteries. One set was in use while the other two were being charged. The Court in finding them too exempt found:

> Without having those sets of batteries, the scoop would only be used part-time. The batteries are not surplus or extra, but are required for the scoop to be fully operational.

By comparison, if the extra parts were not purchased, in all probability not only would the bloom caster not be operating, it would not even be operational for initial installation and testing. We also direct the litigants' attention to *Department of Revenue v. Cox Machinery Co., Inc.,* Ky.App., 650 S.W.2d 261 (1982), wherein a crane "and accessory equipment" purchased for a new or expanded industry were held exempt. We find no difference between

---

**1.** *Schenley Distillers also adopted the integrated*  *plant theory into Kentucky taxation law.*

"first spares" necessary for installation and extra batteries, accessory equipment and appurtenant equipment "necessary to the completed installation."

■ The second phase of this sales and use tax litigation involves bearings but only the bearings used on the rollers and none of the others, of which there are many types used by Armco in the maintenance and service areas of its operation. These latter items, appellee admits, are taxable but not those used on the rollers. Roller tables consist of a number of cylinders laid in rows upon which slabs of steel weighing 36,000 pounds are dropped with the steel having a temperature in excess of 2000 degrees. These slabs move along the tables at speeds of 400 to 2000 feet per minute where they are cooled by water, reheated, reshaped and reduced through the rolling process which is followed by coiling. Each of the cylinders mentioned above has a part at either end and these are the bearings that are the subject of this appeal.

Bearing life must be measured by a number of factors, the first of which is a standard of 1,000,000 revolutions during which there is a failure rate of 10%. Through its manufacturing schedule Armco demonstrated the rollers would complete 1,000,000 revolutions every three or four days. Not only the turning but also the factors of shaft alignment, heat, expansion, shock from slab drops, slab stoppages and dirt and grime had a direct effect on the life of the bearings. Lubricants were employed, but heat expansion and the washing process reduce or destroy the effectiveness of the lubricants thus leaving friction or abrasion on the bearings. Armco dealt with this problem by having its supplier, Bruening Bearings, Inc., make twice daily shipments seven days per week in addition to 300 special deliveries and 500 emergency deliveries during a twelve month period for some ten years. The supplier made quarterly reports of the bearing deliveries to the taxpayer which are reflected in the record.

Appellant maintains that the bearings were repair parts while appellee maintains these were industrial supplies having a useful life of less than one year. The Revenue Cabinet makes much of the fact that the parts were not lubricants. Armco never did take the position that they were such per se, but argued that they, together with the lubricants it did utilize, had the effect of reducing the friction and therefore they were part of the lubricating process. As the court below correctly pointed out "they serve the same purpose as a lubricant." The Board denied the exemption citing KRS 139.170 which deals with machinery purchased for a new or expanded industry. That statute has nothing to do with the exemption claimed for we concern ourselves with 103 KAR 30:130 which was in existence at the time involved but which is now embodied in KRS 139.470(11). Section two of the regulation provided that tangible personal property directly used in the manufacturing process was exempt from taxation if that property had a useful life of less than one year. The regulation went further and suggested some examples of supplies and industrial tools which were to be exempt, but we do not consider those items mentioned to be all inclusive or to the exclusion of other items. The language used which leads us to this conclusion are words "such as" under both (b), supplies and (c), industrial tools and also "etc." under the latter section. We find that if items "such as" jigs, dies, drills, cutters, rolls, reamers, grinding wheels, bits, cutting blades, and "etc." are proper for tax exemption, then there is no reason to exclude parts which have a useful life of less than a year, are used directly in the manufacturing process and properly fall within either category of supplies or industrial tools. Again, we refer to *Schenley Distillers, Inc., supra.*

It is not unreasonable to perceive the bearings as part of the anti-friction process for it is this component along with the lubricant that attempts to reduce the abrasion, but under our interpretation of the requirements of the exemption regulation, it is unnecessary to denominate the parts as a lubricant.

We have not overlooked the evidence of appellant's sole witness, Donald L. Cole, whose academic accomplishments certainly qualify him to be a consultant in mechani-

cal engineering upon a theoretical basis, but he could point to no actual experience in the steel manufacturing industry. All of the substantial evidence was presented by and supported the appellee. As to the law, the court correctly applied the same while the Board's views were not in conformity therewith.

The judgment is affirmed.

All concur.