RENDERED: DECEMBER 15, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0300-DG

CENTURY ALUMINUM OF KENTUCKY, GP APPELLANT


ON REVIEW FROM COURT OF APPEALS
V. NO. 2020-CA-0301
FRANKLIN CIRCUIT COURT NO. 19-CI-00424


DEPARTMENT OF REVENUE, APPELLEE
FINANCE AND ADMINISTRATION CABINET,
COMMONWEALTH OF KENTUCKY


**OPINION OF THE COURT BY JUSTICE HUGHES**

**REVERSING AND REMANDING**

Kentucky Revised Statutes (KRS) Chapter 139 provides for the collection of state sales and use taxes, although some sales transactions are tax exempt. In particular, "supplies" purchased by a manufacturer are tax exempt, but "repair, replacement, or spare parts" are not. In this case, Century Aluminum of Kentucky, GP (Century) and the Department of Revenue (Department) disagree as to the interpretation of the statutes which categorize tangible personal property as either tax-exempt supplies or taxable repair, replacement, or spare parts. While the Kentucky Claims Commission (Claims Commission) agreed with Century's interpretation, the Franklin Circuit Court and the Court of Appeals did not. On discretionary review, this Court concludes that, consistent with the statute, a tax-exempt supply is consumed within the

manufacturing process and has a useful life less than one year, making it an item which the manufacturer inevitably, regularly, and/or frequently buys to maintain the manufacturing process. This regularly consumed supply is distinguishable from a taxable repair, replacement, or spare part, which maintains, restores, mends or repairs solid machinery or equipment of a long-term or permanent nature and which does not necessarily have a known, limited useful life. As to the items at issue in this case, we conclude that the Claims Commission's Final Order was supported by substantial evidence in the record. Consequently, we reverse the Court of Appeals' opinion affirming the Franklin Circuit Court and remand this case to the Claims Commission for reinstatement of its Final Order.

## FACTUAL AND PROCEDURAL BACKGROUND

Century manufactures aluminum in Hawesville, Hancock County, Kentucky. As part of that business, Century purchased anode stubs, Inductotherm lining, thermocouples and tube assemblies, and welding wire and industrial gases from Kentucky vendors in the relevant time period. The vendors collected sales tax from Century on the items and remitted the tax to the Department. Subsequently, Century concluded the purchased items were properly characterized as tax-exempt supplies, not taxable repair, replacement or spare parts. Each vendor filed a refund request for purchases made from November 2010 to May 2015. The Department denied the refund requests and each vendor timely filed a protest with the Department but the protests were denied. The vendors then assigned their rights in the refund requests to

Century and Century proceeded as assignee in an effort to secure the refunds. At Century's request, the Department issued a Final Ruling Letter for each vendor. Century then filed Petitions of Appeal with the Claims Commission. The appeals were consolidated into a single case[1] and the Claims Commission conducted a KRS Chapter 13B evidentiary hearing during which three witnesses testified.

William Morgan, Jr., Century's Technical Manager (Manager), having thirty years of experience in the aluminum industry, testified on Century's behalf. The Manager explained Century's aluminum making process through testimony and exhibits entered into the record. The Manager testified as to the necessity of each item to the manufacturing process, how long the item lasts, and the cause of the item becoming unusable. The Manager further testified as to whether the newly-purchased item was used to maintain, restore, mend or repair the old item.[2]

Robert C. Clark, a certified public accountant, also testified on Century's behalf. Clark, a retired Department employee familiar with the statutes at issue, testified that the items should have been exempted from sales tax and the refunds given.[3]

---

[1] The Claims Commission consolidated File Numbers K17-R-39 (anode stubs); K17-R-40 (Inductotherm lining); K17-R-43 (thermocouples and tube assemblies); K17-R-44 (welding wire and industrial welding gases); and K17-R-45 (refractory materials). The refractory materials dispute settled and is no longer an issue on appeal.

[2] The Department framed its question differently for the industrial gas used for welding.

[3] Century raises the doctrine of contemporaneous construction as another reason for a decision in its favor. Because our interpretation of the statutes results in

Richard Dobson, an Executive Director with the Department, testified on behalf of the Department that the sales and use tax exemption is not applicable to the items in dispute. He explained that if an item which meets the qualification of a tax-exempt supply also meets the definition of a taxable part, then that item will be held taxable. Citing *Mansbach Metal Company v. Department of Revenue*, 521 S.W.2d 85, 87 (Ky. 1975), and *Century Indemnity Co. of Chicago, Ill. v. Shunk Mfg. Co.*, 68 S.W.2d 772, 774 (Ky. 1934), to the Claims Commission as guidance distinguishing between tax-exempt supplies under KRS 139.470(10)[4] and taxable parts under KRS 139.010(26), the

---

a decision in Century's favor, we need not and do not address Century's argument that without basis the Department is changing its interpretation of the statutes and applying the statutes inconsistently.

[4] Between 2010 and 2015, the time frame for the purchases at issue, the statutory text describing tax-exempt supplies was codified within KRS 139.470(11) (July 13, 1990 through June 30, 2013) or KRS 139.470(10) (July 1, 2013 through Apr. 26, 2018). *See* selected Acts: 1990 Ky. Acts ch. 414 (eff. July 13, 1990), 2013 Ky. Acts ch. 119 (eff. July 1, 2013), 2016 Ky. Acts ch. 111 (eff. Jan. 1, 2017), 2018 Ky. Acts ch. 207 (eff. Apr. 27, 2018). The evidentiary hearing was held September 20, 2018; the Claims Commission's Final Order cites KRS 139.470(9), the codification effective April 27, 2018. 2018 Ky. Acts ch. 207. Before this Court, Century cites KRS 139.470(10), in effect in 2015. The Department, however, cites KRS 139.470(9), containing amendments to its preceding codification within KRS 139.470(10). While the Department views the amendments contained within KRS 139.470(9) as immaterial to the statutory interpretation question presented, KRS 139.470(9)'s codification changed KRS 139.470(10)'s text describing the calculation of gross receipts. While that and other changes, some of which the Department incorporated into its statutory interpretation arguments, may not be material, we need not decide that at this point. Properly, only KRS Chapter 139 statutes in effect in 2015 are considered within this Opinion.

Pertinently, in 2015, KRS 139.470 provided that manufacturing and industrial businesses are exempt from paying taxes on certain gross receipts as follows.

There are excluded from the computation of the amount of taxes imposed by this chapter:

. . . .

4

(10) Gross receipts derived from the sale of, and the storage, use, or other consumption in this state of, tangible personal property to be used in the manufacturing or industrial processing of tangible personal property at a plant facility and which will be for sale. The property shall be regarded as having been purchased for resale. "Plant facility" shall have the same meaning as defined in KRS 139.010. For purposes of this subsection, a manufacturer or industrial processor includes an individual or business entity that performs only part of the manufacturing or industrial processing activity and the person or business entity need not take title to tangible personal property that is incorporated into, or becomes the product of, the activity.

(a) Industrial processing includes refining, extraction of petroleum and natural gas, mining, quarrying, fabricating, and industrial assembling. As defined herein, tangible personal property to be used in the manufacturing or industrial processing of tangible personal property which will be for sale shall mean:

1. Materials which enter into and become an ingredient or component part of the manufactured product;

2. Other tangible personal property which is **directly used in manufacturing or industrial processing, if the property has a useful life of less than one (1) year**. Specifically these items are categorized as follows:

  a. Materials. This refers to the raw materials which become an ingredient or component part of supplies or industrial tools exempt under subdivisions b. and c. below.

  b. Supplies. This category includes supplies such as lubricating and compounding oils, grease, machine waste, abrasives, chemicals, solvents, fluxes, anodes, filtering materials, fire brick, catalysts, dyes, refrigerants, explosives, etc. The supplies indicated above need not come in direct contact with a manufactured product to be exempt. "Supplies" does not include repair, replacement, or spare parts of any kind.

  c. Industrial tools. This group is limited to hand tools such as jigs, dies, drills, cutters, rolls, reamers, chucks, saws, spray guns, etc., and to tools attached to a machine such as molds, grinding balls, grinding wheels, dies, bits, cutting blades, etc. Normally, for industrial tools to be considered directly used in manufacturing, they shall come into direct contact with the product being manufactured; and

3. Materials and supplies that are not reusable in the same manufacturing process at the completion of a single manufacturing cycle, excluding repair, replacement, or spare parts of any kind. A single

5

Department explained its position as being that all the items in question simply "wear out," making them taxable repair and replacement parts, not tax-exempt supplies which are "used up."

After hearing evidence, the Hearing Officer recommended disposition in favor of Century on all claims. The Claims Commission issued its Final Order on March 27, 2019, adopting the Hearing Officer's findings of fact[5] and conclusions of law. Thus, the Claims Commission concluded that the anode stubs, Inductotherm lining, thermocouples and tube assemblies, and welding wire and industrial gases used for welding are tax-exempt supplies under KRS 139.470(10)(a)2.b.

In reaching this conclusion, the Claims Commission rejected the Department's interpretation of the statutes, an interpretation that would allow most tangible personal property that meets the criteria for a tax-exempt supply to also be categorized as a taxable part. Concluding that the statutes require harmonization to give each effect, the Claims Commission relied upon *Mansbach* (also cited by Century) as supporting a decision in the

---

manufacturing cycle shall be considered to be the period elapsing from the time the raw materials enter into the manufacturing process until the finished product emerges at the end of the manufacturing process.

(b) It shall be noted that in none of the three (3) categories is any exemption provided for repair, replacement, or spare parts. Repair, replacement, or spare parts shall not be considered to be materials, supplies, or industrial tools directly used in manufacturing or industrial processing. "Repair, replacement, or spare parts" shall have the same meaning as set forth in KRS 139.010.

(Emphasis added.)

[5] The findings of fact are within the conclusions of law section.

manufacturer's favor. Based upon *Mansbach*, the Claims Commission concluded that if an item may be categorized as either a supply or as a part, the test for final categorization is whether the item is intended to be used up in the manufacturing process or simply wears out. The Claims Commission also stated that under the test proposed by Century for determining whether the tangible personal property is being consumed in the manufacturing process, the items at issue would be categorized as tax-exempt.[6] The Claims Commission observed that although the Department advocated that *Century Indemnity* supports a decision in the Department's favor, the "supply" test enunciated in that case actually results in the items at issue being categorized as tax-exempt supplies, not taxable parts. Notably, the Department did not cite *Century Indemnity* in its subsequent appellate briefs.

---

[6] The test Century offered to distinguish between tangible personal property that may be categorized as both a tax-exempt supply and a taxable part follows:

    A. Determine the useful life of the tangible personal property at issue if the machine or equipment that the tangible personal property allegedly maintains, restores, mends, or repairs is operating **without** the introduction of the product being manufactured.

    B. Determine the useful life of the tangible personal property at issue if the machine or equipment that the tangible personal property allegedly maintains, restores, mends, or repairs is operating **with** the introduction of the product being manufactured.

    C. If there is a difference in the useful life of the tangible personal property between a. and b. above then the tangible personal property is being consumed in the manufacturing process and is exempt from tax.

    D. If there is no difference in the useful life of the tangible personal property between a. and b. above then the tangible personal property is a taxable repair, replacement or spare part.

In its petition for review in Franklin Circuit Court, the Department claimed that the Claims Commission erred both as a matter of fact and as a matter of law in determining that all of the items in question are exempt under KRS 139.470(10). The Department sought review of the Claims Commission's Final Order on the following grounds: the Claims Commission's decision is in violation of constitutional or statutory provisions; in excess of the statutory authority of the agency; without support of substantial evidence on the whole record; legally deficient, contrary, or not in conformity to the applicable law and undisputed facts; arbitrary; and/or subject to reversal for any ground referred to in KRS 13B.150 that may be apparent from the law and facts presented by this case and record made before the Claims Commission.[7]

---

[7] KRS 13B.150(2), pertaining to judicial review of an agency's final order, states in full:

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the final order or it may reverse the final order, in whole or in part, and remand the case for further proceedings if it finds the agency's final order is:

(a) In violation of constitutional or statutory provisions;

(b) In excess of the statutory authority of the agency;

(c) Without support of substantial evidence on the whole record;

(d) Arbitrary, capricious, or characterized by abuse of discretion;

(e) Based on an ex parte communication which substantially prejudiced the rights of any party and likely affected the outcome of the hearing;

(f) Prejudiced by a failure of the person conducting a proceeding to be disqualified pursuant to KRS 13B.040(2); or

(g) Deficient as otherwise provided by law.

In regard to the evidence, the Department recounted the Manager's testimony that: as to the anode stubs, they are used to "**maintain** the anode assembly . . . to **maintain** [the] manufacturing process"; as to the Inductotherm lining, "changing the lining . . . **maintains** the furnace in its operational condition"; as to the welding wire and welding gas, along with the anode stubs, they are used to "**restor[e]** the anode assembly to its as-new condition"; and as to the thermocouples and tube assemblies, the newly-introduced thermocouples and tube assemblies "**replace** the existing one[s]." The Department emphasized that the Manager testified that each of the items in question was used to "maintain" a manufacturing process or to "maintain" or "repair" a piece of machinery (referring to anode stubs, Inductotherm lining, and welding wire and gases as machinery) or was a replacement for an existing piece of equipment (referring to thermocouples and tube assemblies as equipment). The Department then argued that the preponderance of the evidence introduced at the evidentiary hearing establishes, as a matter of fact, that the anode stubs, Inductotherm lining, thermocouples and tube assemblies, and welding wire and industrial gases are properly classified as repair, replacement, or spare parts which do not qualify for sales tax exemption under KRS 139.470(10).

The Franklin Circuit Court agreed with the Department that the proper test for categorizing taxable parts and tax-exempt supplies, respectively, is whether the tangible personal property is introduced into the manufacturing process to maintain, restore, mend, or repair a machine or equipment or

9

whether the tangible personal property is used up or consumed as a consequence of its involvement in the manufacturing process. Also, in agreement with the Department, the Franklin Circuit Court considered the initial question to be whether the tangible personal property meets the qualification of a repair, replacement, or spare part, and if so, no further analysis is required. The Franklin Circuit Court stated that the evidence in the record, including testimony by Century's expert, makes clear that the anode stubs, Inductotherm lining, thermocouples and tube assemblies, and welding wire and industrial gases were introduced to maintain, restore, mend, or repair machinery or equipment used at Century's facility, so the items are subject to sales and use tax under KRS 139.470(10).[8] The circuit court, further in agreement with the Department, noted that Century's proposed test would not be helpful to distinguish tax-exempt supplies from taxable parts.[9]

Century appealed the Franklin Circuit Court's decision to the Court of Appeals. The Court of Appeals, in a 2-1 decision, affirmed the circuit court. Like the circuit court, the Court of Appeals concluded that KRS 139.470(10)

---

[8] In its appellate brief to the circuit court, the Department also presented a test for distinguishing tax-exempt supplies from taxable parts. In contrast to its position that all the items were either repair or replacement parts, the Department offered a concession on the Inductotherm lining, explaining it may be classified as a tax-exempt supply under KRS 139.470(10)(a)2.b. Despite the Department's concession, the Franklin Circuit Court reversed the Claims Commission's decision entirely. The Department did not offer a concession in its subsequent appellate briefs.

[9] The circuit court viewed the proposed test as ignoring the fact that all tangible personal property used in the manufacturing process wears down or is used up, therefore, all tangible personal property could have a different useful life once introduced into the manufacturing process. The circuit court explained that the test would exempt nearly all tangible personal property from sales and use tax which is clearly not the intent of KRS 139.470.

10

and KRS 139.010(26) are not in conflict and do not need to be harmonized, making Century's proposed test unnecessary. The Court of Appeals, considering the express language of the statutes, concluded that the circuit court properly interpreted the statutes. The Court of Appeals, like the circuit court, then considered the testimony the Department pointed to as supportive of factual findings that the items at issue met the definition of a repair, replacement, or spare part. The Court of Appeals agreed with the circuit court's "application of the law to the facts" and concluded that the items were introduced "to maintain, restore, mend, or repair machinery or equipment" and, therefore, are taxable. This Court granted Century's request for discretionary review.

## ANALYSIS

As noted, this appeal stems from the Kentucky Claims Commission's, Tax Appeals, decision in favor of Century. Being an appeal from an administrative agency's decision, KRS Chapter 13B applies and appellate review of the Claims Commission's Final Order is limited. *See* KRS 13B.150.[10] While the Department's petition to the Franklin Circuit Court for reversal of the Claims Commission's Final Order encompassed most of the bases by which the order could be reversed, the Department's briefs to the circuit court and to the Court of Appeals honed the Department's arguments. The Department alleged that the Claims Commission erred in its interpretation of KRS 139.470(10) and

---

[10] The full text of KRS 13B.150 is provided in note 7 above.

KRS 139.010(26) and that the Claims Commission's Final Order violates KRS 13B.150(2)(c), (d), and (g). The Department thus maintained under these KRS 13B.150 provisions that the Claims Commission's Final Order is "without support of substantial evidence on the whole record," KRS 13B.150(2)(c); is "arbitrary, capricious, or characterized by abuse of discretion,"[11] KRS 13B.150(2)(d); and is "deficient as otherwise provided by law," KRS 13B.150(2)(g).

The circuit court and the Court of Appeals concluded that the Claims Commission erred in its statutory interpretation but as reflected in the factual and procedural background, rather than acting in accordance with KRS 13B.150(2)'s directive that an appellate court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," the circuit court acted as a fact-finder and the Court of Appeals agreed with the circuit court's application of the law to the facts.[12] Upon review, we reverse the Court of Appeals' decision and accordingly, the circuit court's decision. We agree with the Claims Commission's ultimate conclusion that a distinguishing difference between a tax-exempt supply and a taxable part is whether the tangible personal property is consumed in the manufacturing process and has

---

[11] In its circuit court brief, the Department asserted that: "Failure to take into consideration the unrefuted testimony of Century's own expert witness . . . is clearly in disregard of the substantial evidence on the whole record, which is, in itself, arbitrary and capricious."

[12] The Department presents new arguments in its brief to this Court, such as Century does not directly use welding gas in its manufacturing of aluminum for sale. These arguments were not presented to or addressed by the fact-finder and are beyond this Court's purview.

a useful life less than one year, but our decision is reached based upon the plain language of the statutes. We also conclude that the Claims Commission's findings of fact are supported by substantial evidence and that the Claims Commission's Final Order did not violate KRS 13B.150(2)(d) or (g).

With Century's aluminum making process providing the context for understanding KRS 139.470(10) and KRS 139.010(26)'s application and the parties' respective statutory interpretation arguments, we first provide a simple description of the aluminum making process used by Century at its Hawesville plant.

**Century's Aluminum Making Process**

Century manufactures aluminum through a process call "electrolysis" during which high voltage electricity is passed through an "anode assembly" to a carbon anode in a molten electrolyte bath in which alumina[13] is dissolved. An anode assembly consists of (1) an aluminum stem or rod, (2) a transition joint, and (3) a steel anode yoke including its arms and steel anode stubs. The transition joint allows the aluminum rod to be joined to the steel yoke. The steel yoke is joined to the carbon anode by inserting the steel anode stubs into formed holes at the top of the carbon anode and joining the anode stubs to the carbon anode using cast iron. Thus, a carbon anode is attached to an anode assembly by the anode stubs, and the anode stubs then allow DC electrical current from the anode assembly through the carbon anode and into the

---

[13] Alumina is the raw material from which aluminum is made.

13

molten electrolyte bath so that electrolysis can take place and aluminum can be manufactured.

Loss of anode stub material occurs as part of the manufacturing process. One mechanism for this loss occurs when the anode stub comes into contact with molten electrolyte. When this happens, part of the anode stub is dissolved in the bath. The anode stub loss will reach the point that a new anode stub will need to be attached to the yoke in order for the electrolysis procedure to continue. Century uses welding wire and welding gas to attach a new anode stub.

The Inductotherm furnace is the place where the cast iron used to join the anode stubs and carbon anode is melted. The furnace has a lining, the Inductotherm lining, between the induction coils and the molten metal. The lining must be thick enough to fully protect the coils and to prevent metal run out in order to avoid severe accidents. The lining is subject to normal wear as a result of the scraping action of metal on the furnace walls. When the minimum lining thickness is detected, the furnace is taken out of service and relined.

**Relevant Statutes and Caselaw**

Under KRS 139.470, manufacturers and industrial processers—businesses which use machinery; equipment; repair, replacement, and spare parts for machinery and equipment; materials; supplies; and industrial tools—receive a tax break when purchasing tangible personal property meeting the

statutory definition of materials, supplies or industrial tools.[14]  The criteria for determining whether an item is a tax-exempt material, supply or industrial tool is explained within KRS 139.470 or within KRS 139.010's definitions.

As an initial matter, the gross receipts[15] exempt from tax collection must be "derived from the sale of,[16] and the storage,[17] use,[18] or other consumption in this state of, tangible personal property[19] to be used in the manufacturing[20] or industrial processing[21] of tangible personal property at a plant facility[22] and which will be for sale."  KRS 139.470(10).  Notably, in contrast to other terms in this provision, "consumption" is not a defined term in KRS 139.470 or KRS 139.010.

Categorization of an item as a supply is, of course, at the heart of this dispute.  Beyond being tangible personal property, criteria for an item to be categorized as a supply include the item's consumption when used in the

---

[14] KRS 139.480(10) provides a sales and use tax exemption for machinery qualifying as "machinery for new and expanded industry."  2014 Ky. Acts ch. 129 (eff. Aug. 1, 2014).

[15] KRS 139.010(12) defines "gross receipts."  2011 Ky. Acts ch. 33 (eff. July 1, 2011).

[16] KRS 139.010(30) defines "sale."  *Id.*

[17] KRS 139.010(32) defines "storage."  *Id.*

[18] KRS 139.010(36) defines "use."  *Id.*

[19] KRS 139.010(33) defines "tangible personal property" as "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses and includes natural, artificial, and mixed gas, electricity, water, steam, and prewritten computer software."  *Id.*

[20] KRS 139.010(16) defines "manufacturing."  *Id.*

[21] KRS 139.470(10)(a) describes "industrial processing."  2013 Ky. Acts ch. 119.

[22] KRS 139.010(21) defines "plant facility."  2011 Ky. Acts ch. 33.

15

manufacturing or industrial processing, KRS 139.470(10), being directly used in manufacturing or industrial processing, KRS 139.470(10)(a)2, and having a useful life of less than one (1) year, *id.* Examples of supplies are "lubricating and compounding oils, grease, machine waste, abrasives, chemicals, solvents, fluxes, anodes, filtering materials, fire brick, catalysts, dyes, refrigerants, explosives, etc." KRS 139.470(10)(a)2.b. Supplies do "not include repair, replacement, or spare parts of any kind." *Id.*

In regard to "repair, replacement, or spare parts," KRS 139.470(10)(b) states:

> [I]n none of the three (3) categories [identifying tangible personal property which is tax-exempt] is any exemption provided for repair, replacement, or spare parts. Repair, replacement, or spare parts shall not be considered to be materials, supplies, or industrial tools directly used in manufacturing or industrial processing. "Repair, replacement, or spare parts" shall have the same meaning as set forth in KRS 139.010.
>
> As defined in KRS 139.010, unless the context otherwise provides,
>
> (a) "Repair, replacement, or spare parts" means any tangible personal property [("personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses and includes natural, artificial, and mixed gas, electricity, water, steam, and prewritten computer software")] used to maintain, restore, mend, or repair machinery or equipment.
>
> (b) "Repair, replacement, or spare parts" does not include machine oils, grease, or industrial tools.

KRS 139.010(26).

In this case, using *Mansbach* as guidance, the Claims Commission found that the items in dispute met the criteria to be categorized as tax-exempt

16

supplies because all of the items at issue are tangible personal property, have a direct use in manufacturing in a manufacturing facility, and have a useful life of less than one year. Consistent with its citations to the Claims Commission and the other appellate courts, Century cites *Mansbach* to this Court in support of a decision in its favor. Century maintains that *Mansbach*, decided in 1975 and dealing with interpretation of a regulation, Regulation No. SU-5 (the contents of which were subsequently incorporated in KRS Chapter 139's statutory framework and are at issue in this case), is guidance for distinguishing tangible personal property which seemingly constitutes both tax-exempt supplies and taxable parts.

In *Mansbach*, the Department disagreed with Mansbach Metal Company's treatment of various items as tax exempt under Regulation No. SU-5, adopted in 1960, which provided that sales and use taxes were not collected on "tangible personal property to be used in the manufacturing or industrial processing of tangible personal property," including

> 2. Materials, supplies (including molds, lubricating and compounding oils, grease, machine waste, abrasives, grinding balls, grinding wheels, chemicals, solvents, fluxes, anodes, fire brick, catalysts, filtering materials, dyes, refrigerants, explosives, etc.), and industrial tools (jigs, dies, drills, cutters, rolls, reamers, chucks, saws, spray guns, etc.) which are directly used in manufacturing or industrial processing, if such materials, supplies or industrial tools have a useful life of less than one year.

521 S.W.2d at 86-87.

Mansbach Metal Company's tax return had described most items purchased using specific descriptions identifying the item as a part for a machine having a relatively short useful life due to wearing out with use. The

17

other items were described generally using terms such "miscellaneous parts and supplies," "repair material," "supplies," "material," and "repair parts." When Mansbach Metal Company appealed the Department's tax assessment to the then-Kentucky Board of Tax Appeals, the parties stipulated that the disputed items were "materials and supplies" purchased by Mansbach Metal Company "which have a useful life of less than one (1) year and which were necessary for the operation, maintenance and repair of certain machinery and equipment directly used in the processing and producing functions of petitioner's business." *Id.* at 86.

Finding that the items in question were primarily repair and replacement parts, the Board of Tax Appeals concluded that the items were not exempt from sales and use tax. The Franklin Circuit Court upheld the Board's decision. Our predecessor Court also upheld the Board's decision, noting that the regulation did not use the word "parts" and that none of the things listed in the regulation as a material or supply could be considered a part. The Court was unpersuaded by Mansbach Metal Company's argument that the basis for materials' and supplies' tax-exempt status—the characteristic of having a useful life of less than one year—applied equally to parts. The Court also explained that while the regulation must be narrowly construed, even under a liberal construction, a distinction could be drawn between materials and supplies and parts, that distinction being that materials and supplies are designed and intended to be used up in the manufacturing process and parts simply wear out. *Id.* at 86-87.

18

While the parties apparently agree with *Mansbach*'s characterization of the difference between supplies and parts, the parties do not agree on the role *Mansbach* should play in the interpretation of KRS 139.470(10)(a)2.b. and KRS 139.010(26). Because the General Assembly in 1994, after the *Revenue Cabinet v. Armco, Inc.*, 838 S.W.2d 396 (Ky. App. 1992), decision,[23] amended KRS 139.470 to state that "repair, replacement and spare parts," are not tax-exempt, defined "repair, replacement and spare parts" at the same time, and added the provision that "supplies" do not include repair, replacement, or spare parts of any kind,[24] the Department argues that there is no need to look

---

[23] *Armco* held that replacement ball bearings which were used as part of a lubricating system were not excluded from tax exemption under 103 KAR 30:130, embodied at that point in KRS 139.470(11). The *Armco* court stated that "there is no reason to exclude parts which have a useful life of less than a year, are used directly in the manufacturing process and properly fall within either category of supplies or industrial tools." *Id.* at 402.

[24] After its amendment in 1992, then KRS 139.470(11)(b) provided:

> It shall be noted that in none of the three (3) categories is any exemption provided for repair parts. KRS 139.170 specifically holds replacement machinery shall be taxable. Since replacement machinery is subject to tax, it necessarily follows that repair or replacement parts shall be subject to tax. Repair parts shall not be considered to be materials, supplies, or industrial tools directly used in manufacturing or industrial processing.

1992 Ky. Acts ch. 214.

> After its amendment in 1994, then KRS 139.470(11)(b) provided:

> It shall be noted that in none of the three (3) categories is any exemption provided for repair, replacement, or spare parts. . . . Repair, replacement, or spare parts shall not be considered to be materials, supplies, or industrial tools directly used in manufacturing or industrial processing.

1994 Ky. Acts. ch. 501. Within the same Act, under KRS 139.470(11)(a)(2)b, the General Assembly added the sentence, "'Supplies' does not include repair, replacement, or spare parts of any kind[,]" and under KRS 139.170(2), defined

19

beyond the statutory language and asserts that only those items listed as supplies in KRS 139.470(10)(a)2.b. and items that are of the same kind, class or nature as the listed items are exempt from sales and use tax. The Department further argues that tangible personal property items which "maintain, restore, mend or repair machinery or equipment" at a manufacturing plant are expressly taxable and that the legislature intended that the limited sales and use tax exemption should never be applied to repair, replacement, or spare parts. Therefore, if the item may be categorized as a taxable part, whether the item has characteristics of a tax-exempt supply is of no consequence. Seeing no conflict between the statutes, the Department maintains no harmonization of KRS 139.010(26) and KRS 139.470(10) is required.[25]

While we agree with the Department that the plain language of the statutes resolves this dispute, that plain language results in a decision in Century's favor. Furthermore, upon consideration of the statutory language as a whole, that plain language incorporates the principles expressed in *Mansbach* and *Century Indemnity*.

---

"[r]epair, replacement, or spare parts" to mean "any tangible personal property used to maintain, restore, mend, or repair machinery or equipment. 'Repair, replacement, or spare parts' does not include machine oils, grease, or industrial tools."

[25] In relation to this argument, the Department asserts that Century's own expert witness testimony made clear that all the tangible personal property at issue in this case was used to "maintain, restore, mend, or repair machinery or equipment" in Century's plant facility.

When presented with an issue of statutory interpretation, we begin with the plain words of the statute. *Revenue Cabinet v. O'Daniel,* 153 S.W.3d 815, 819 (Ky. 2005). "Our ultimate goal when reviewing and applying statutes is to give effect to the intent of the General Assembly. We derive that intent from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Commonwealth v. Wright,* 415 S.W.3d 606, 609 (Ky. 2013); *see* KRS 446.080(1), KRS 446.080(4). Furthermore, "[t]he statute must be read as a whole and in context with other parts of the law. All parts of the statute must be given equal effect so that no part of the statute will become meaningless or ineffectual." *Lewis v. Jackson Energy Co-op. Corp.,* 189 S.W.3d 87, 92 (Ky. 2005); *accord Department of Revenue v. Cox Interior,* 400 S.W.3d 240, 242 (Ky. 2013). When the meaning of the statutory language is plain and unambiguous, a court cannot base its interpretation on any other method or source. *Mills v. City of Barbourville,* 117 S.W.2d 187, 188 (Ky. 1938). "Only if the statute is ambiguous, however, or otherwise frustrates a plain reading, do we resort to the canons or rules of construction, such as the rule that tax exemption statutes are to be narrowly construed against the exemption." *King Drugs v. Commonwealth,* 250 S.W.3d 643, 645 (Ky. 2008) (citing *Stephenson v. Woodward,* 182 S.W.3d 162 (Ky. 2005)). Furthermore "when interpreting a provision of a statute, a court should not, if possible, adopt a construction that renders a provision meaningless or ineffectual or interpret a provision in a manner that brings about an absurd or unreasonable result." *Schoenbachler v.*

21

*Minyard,* 110 S.W.3d 776, 783 (Ky. 2003) (citations omitted).  However, when "there is an apparent conflict between statutes or sections thereof, it is the duty of the court to try to harmonize the interpretation of the law so as to give effect to both sections or statutes if possible." *Ledford v. Faulkner,* 661 S.W.2d 475, 476 (Ky. 1983).

Resolution of the dispute between the parties comes down to whether the tangible personal property is consumed within the manufacturing process and has a useful life of less than one year, KRS 139.470(10)(a)2.b., or constitutes part of the machinery or equipment which supports the manufacturing process, KRS 139.010(26).  *See also* KRS 139.010(16) (defining "manufacturing" and reflecting, as commonly understood, that while related there is a difference between the manufacturing process and the operation of machinery).[26]  Although the Department's focus has been on the use of repair and replacement parts "to maintain, restore, mend or repair" and the Department emphasizes the Manager's use of those very words in his testimony (i.e., "replaces" and "maintains," words which refer to the defined term itself or are included in its definition), review of the statutes makes clear that the terms

---

[26] "Manufacturing" means any process through which material having little or no commercial value for its intended use before processing has appreciable commercial value for its intended use after processing by the machinery.  The manufacturing or processing production process commences with the movement of raw materials from storage into a continuous, unbroken, integrated process and ends when the product being manufactured is packaged and ready for sale.

KRS 139.010(16).

22

"machinery" and "equipment" play an important role in defining taxable parts and must be given effect.

Neither "machinery" nor "equipment" is defined within KRS 139.470 or KRS 139.010, but "common and everyday" meanings of those terms are a starting point. KRS 446.015 (statutes to be "written in nontechnical language and in a clear and coherent manner using words with common and everyday meaning"). Once it is determined that machinery or equipment is involved, the question of whether the tangible personal property is a repair, replacement or spare part can then be addressed. However, if no machinery or equipment is being repaired or replaced, according to the definition of a repair or replacement part in KRS 139.010(26), the tangible personal property at issue cannot be a repair or replacement part.

Machinery and equipment are commonly understood to be a solid device made up of solid parts of a long-term or permanent nature.[27] *See Century*

---

[27] A machine may be described as "a piece of equipment with several moving parts that uses power to do a particular type of work." *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/machine (accessed Nov. 2, 2022). Definitions of "machine" also include "a mechanically, electrically, or electronically operated device for performing a task" and "an assemblage of parts that transmit forces, motion, and energy one to another in a predetermined manner;" *Merriam-Webster*, https://www.merriam-webster.com/dictionary/machine (accessed Nov. 2, 2022), whereas "machines in general or as functioning unit" are the machinery performing a task, *id.*, https://www.merriam-webster.com/dictionary/machinery.

This understanding is also present within the Department's regulations related to KRS 139.480 which creates tax-exempt status for the sale, use, storage, or other consumption of "machinery for new and expanded industry." Regulation 103 KAR 30:120, Section 2 (2016) defines "machinery" as:

machines, in general, or collectively; also, the working parts of a machine, engine, or instrument; such as, the machinery of a watch.

23

*Indemnity*, 68 S.W.2d at 774. However, the parts have the potential to deteriorate, wear out, or break, statuses which may be avoided or delayed with care beforehand or which may be addressed after the fact. *See* KRS 139.010(26). Given this understanding of machinery and equipment and using parlance within KRS 139.470 to contrast tax-exempt supplies vis-a-vis machinery and equipment, machinery and equipment parts have the characteristic of not being consumed in the manufacturing process. *See Century Indemnity*, 68 S.W.2d at 774; *Mansbach*, 521 S.W.2d at 87. While "consumption" is another term not defined in KRS 139.470 or KRS 139.010, *Century Indemnity*, the non-tax case cited favorably by the Department to the Claims Commission, noted acceptance of the idea that what may initially be thought of as machinery or equipment may lose that identity because of its consumption, resulting in its categorization as a supply.

*Century Indemnity*, a road construction contract case, addressed whether the rental of machinery, its damage by negligent use, certain items of freight, and the loss or misplacement of equipment were either "materials" or "supplies" within the meaning of those terms as used in the surety bond at issue. In its review of dictionaries, a treatise and other state cases which had also considered the meaning of the terms, *Century Indemnity* described the

---

(Webster's New International Dictionary). This definition does not require machinery to have working parts and be able to perform a function in and of itself, as a "machine" would. The machinery of a manufacturing operation is composed of all the components making up the process, including the fixed and nonmoving parts as well as the moving parts. This is illustrated in the example of the machinery of a watch.

24

terms as universally defined.  As might be expected in comparison, *Century Indemnity* defined "materials" consistent with the meaning expressed in KRS 139.470.  *See Century Indemnity*, 68 S.W.2d at 773.  For "supplies," *Century Indemnity*'s definition reflects the examples KRS 139.470 uses to describe "supplies."  *See id.* at 773-74.  In particular, *Century Indemnity* cites "supplies" as being defined as "articles furnished for carrying on work, which, from its nature, are necessarily consumed by the use in the work."  *Id.* at 774.  Of particular importance to this case, *Century Indemnity* also noted, "Where articles are totally used up in the usual and ordinary performance of a contract, so that nothing remains in excess of normal salvage, they lose their identity as tool, appliances, implements and machinery, and are included in the broader definition of 'supplies.'"  *Id.* (citing 60 *Corpus Juris* 1167, then *U. S. Rubber Co. v. American Bonding Co.*, 149 P. 706 (Wash. 1915), and *Royal Indemnity Co. v. Day & Maddock Co.*, 150 N.E. 426 (Ohio 1926)).

We agree with the Department's position as stated to the Claims Commission that the preceding quote from *Century Indemnity* is relevant for distinguishing tax-exempt supplies and taxable parts.[28]  In particular, while not including the condition established for identifying "other tangible personal property" as tax-exempt, i.e., a useful life of less than one year, *Century*

---

[28] The Department cited the preceding quote from *Century Indemnity* to the Claims Commission as guidance (along with *Mansbach*) for distinguishing tax-exempt supplies and taxable parts.  The Department argued, prehearing, that the items at issue are not "used up" in the manufacturing process such that "nothing remains in excess of normal salvage."  Based upon the Manager's testimony at the evidentiary hearing, the Claims Commission concluded *Century Indemnity* did not support the Department's argument.

*Indemnity,* consistent with the understanding that machinery and equipment are not consumed, expresses an objective manner for understanding consumption of tangible personal property within the context of manufacturing and industrial processes.[29]

Reading KRS 139.470(10) and KRS 139.010(26) together and giving KRS 139.010(26) its full effect, they establish that tangible personal property will either fall within the categorization of a repair, replacement, or spare part or a supply. Based upon the characteristics of a supply and the manufacturing process within which its employed, a manufacturer knows it must purchase that supply on a regular basis to keep the manufacturing process going. The consumed, used up, spent supply must be replenished by a new supply. There is a known absolute that without replenishing the supply routinely, the manufacturing process will not last. With machinery and equipment being durable and of a more permanent nature, the time frame for repair and replacement part use is less predictable and may not be routinely scheduled,

---

[29] This expression is similar to that in the Department's test contained in its circuit court brief. When addressing KRS 139.470(10)(a)2.b., the Department stated that tangible personal property may be classified as a supply when its interaction with the heat, cold, physical forces, waste material accumulation, and/or chemical and physical corrosion caused by the manufacturing process cause the item to be physically or chemically altered in a permanent and irreparable manner within the one-year useful life limitation set forth in the statute. In regard to KRS 139.470(10)(a)3., the Department stated that tangible personal property may be classified as a supply if it loses a significant portion of its physical mass or is otherwise rendered substantially useless for its primary purpose in the manufacturing process as a result of its interaction with the heat, cold, physical forces, waste material accumulation, or chemical and physical corrosion caused by the particular manufacturing process, in a single manufacturing cycle or several manufacturing cycles.

yet in contrast to tax-exempt supplies, taxable machinery and equipment parts are generally expected to have a useful life of one year or more.

In this case, if we conclude that the Claims Commission's findings of fact are supported by substantial evidence (and we do), the newly-purchased anode stubs, Inductotherm lining, welding wire and gases, and thermocouples and tube assemblies are not repair or replacement parts for their old counterpart. Instead, based upon their consumption within the manufacturing process and having a useful life of less than one year, the newly-purchased anode stubs, Inductotherm lining, welding wire and gases, and thermocouples and tube assemblies are supplies.

The Department, however, views the definition of a repair, replacement, or spare part as not being limited to maintaining, restoring, mending or repairing its counterpart. As explained above, the Manager's responses at the evidentiary hearing did not describe the newly-purchased items as maintaining, restoring, mending or repairing the old item. Instead, the Manager described the newly-purchased anode stubs, Inductotherm lining, and welding wire and gases as **maintaining** either 1) the furnace; 2) the anode assembly, which beyond the anode stubs at issue, consists of the aluminum stem or rod, the transition joint, and the steel yoke arms; or 3) the manufacturing process. The Claims Commission considered the Department's broad interpretation of the statute—i.e., any part that can be construed as affecting any piece of machinery or equipment in the plant is a taxable repair, replacement or spare part—to be resolved by whether the part is intended to be

27

used up in the manufacturing process or whether it is intended to simply wear out, because otherwise, in most cases, the Department's interpretation renders the supplies exemption meaningless.

With the plain language of the definition of repair, replacement and spare parts restricting the part's use to maintaining, restoring, mending or repairing the actual machinery or equipment, it is clear that tangible personal property which maintains the "manufacturing process," but does not actually replace an existing part of the permanent machine, does not fit within the definition of a taxable part. As for the Department's assertion that the "repair, replacement or spare part" definition may be construed as allowing tangible personal property meeting the criteria of a supply to nonetheless maintain machinery or equipment, we consider that proposition in light of the preceding analysis. With the conclusion that specific tangible personal property is a supply, its defining characteristics exclude it from being categorized as a repair, replacement or spare part and the statute cannot be construed in an absurd, inconsistent manner to allow the same tangible personal property to be viewed also as a part. *Schoenbachler*, 110 S.W.3d at 783. For example, in this case, with the anode stubs being a consumed supply, the newly-purchased anode stubs may not then be also categorized as a part which "maintains" the other components of the anode assembly. *See also* KRS 139.010(26). As exemplified in this case, categorization of tangible personal property as a tax-exempt supply or a taxable part involves multiple criteria and goes beyond portraying

28

testimony as describing tangible personal property as "maintaining" machinery or equipment.

Based upon our review of KRS 139.470(10) and KRS 139.010(26) then, the question whether tangible personal property is a tax-exempt supply or a taxable part, if all the other characteristics of a tax-exempt supply are met, may be resolved by whether the tangible personal property has the characteristics of being consumed in the manufacturing process and having a useful life of less than one year. With this conclusion being in agreement with the Claims Commission's interpretation, we turn to the Department's claim that the Claims Commission's Final Order was not supported by substantial evidence in the record.

**Substantial Evidence Supports the Claims Commission's Findings of Fact**

The Claims Commission found that all of the items at issue are tangible personal property, have a direct use in manufacturing in a manufacturing facility, and have a useful life of less than one year. To determine whether there was substantial evidence to support the Claims Commission's findings of fact upon which its conclusions of law are based, we examine the Manager's testimony for each item in dispute.

### Anode Stubs

The Manager testified that the anode stubs are "necessary in order to complete the electrical circuit that produces the aluminum"; that "[t]he biggest issue is the carbon-stub interface, and that's where the damage occurs. That's where the bath washes over the anode and cuts the stub"; that "in [Century's]

29

process, [the anode stubs] typically last less than a year"; and that once the anode stub is used up, "[i]t is valued at the scrap price of steel."

**Inductotherm Lining**

The Manager testified that the "Inductotherm lining is a refractory lining that separates the molten cast iron from the actual furnace assembly itself, including the heating components and the cooling components." "If that lining wasn't there, [the furnace] couldn't be operated without the lining because cast iron would attack the steel shell and . . . would actually destroy the furnace." In terms of how long the Inductotherm lining lasts, the Manager testified that it will "typically be around a month." The Manager also testified that the Inductotherm lining "actually has no value" after it is used up and has "very little" value for scrap.

**Thermocouples and Tube Assemblies**

The Manager testified: "[T]he thermocouples and tube assemblies are basically just a thermometer. We use those in the reduction cells to measure the temperature of the bath. That's a critical piece of our control of the aluminum process because it gives us specific information about how the pot may be performing and if it's approaching an abnormal condition." "Each thermocouple can last somewhere between 300 and 500" dips into the pots and based upon the number of pots tested per day "the thermocouples would last less than a week." When asked how long the thermocouples and tube assemblies last, the Manager reiterated, "They'll typically last about a week."

30

In terms of their value after being used up, the Manager testified that they have no value.

**Welding Wire and Industrial Gases**

The Manager explained that in the rodding department, welding wire is used to join the anode stubs to the anode yokes and that industrial gases are used in the welding process to provide an inert atmosphere as the weld is taking place. The Manager testified that the welding wire and industrial gases are necessary for the manufacturing process; in order to produce an anode assembly that can be used in the electrolytic cells in the pots, it's necessary to have the anode assembly with four stubs. The Manager stated that the welding wire used in the rodding department lasts "[t]he entire life cycle of the stub" and that after that use, its value is scrap steel. As for the industrial gases used in the rodding department, "[i]t lasts the entire time that the weld is intact." The Manager further stated that the industrial gases have zero value after they are consumed.

Substantial evidence is "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens–Corning Fiberglas Corp. v. Golightly,* 976 S.W.2d 409, 414 (Ky. 1998) (citations omitted). Upon review, we conclude that the Manager's testimony is substantial evidence which supports the Claims Commission's findings of fact. *Cobb v. Commonwealth,* 509 S.W.3d 705, 709 (Ky. 2017).

## CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals. This case is remanded to the Claims Commission for further proceedings consistent with this Opinion.

All sitting. All concur. Keller, J., also concurs by separate opinion.

KELLER, J., CONCURRING: I concur with the Majority's opinion and its interpretation of KRS Chapter 139. However, I write separately to express my concern with the lack of factual findings made by the hearing officer and adopted by the Claims Commission. The final order was factually deficient, including no real justification for its conclusion that "each of the items at issue are designed to be used up during the manufacturing process and, therefore, exempt as supplies under KRS 139.470(10)." The order makes no credibility determinations, nor does it explain *how* it reached its conclusion for each of the items at issue. I am troubled by this deficiency in light of the importance of the result of the Claims Commission for both the manufacturing industry and the Commonwealth at large, as it represents potentially millions of dollars in taxable or tax-exempt expenses.

The Claims Commission's lack of factual findings put the trial court in an untenable position in the face of an incorrect application of law and limited findings. Both the trial court and this Court were forced to scour the record as they resolved the issue in the case at bar. In the interest of judicial economy, I support the Majority's disposal of the issues before us. However, I reiterate that

32

hearing officers must make sufficient findings to support their legal

conclusions.

COUNSEL FOR APPELLANT:

Steven Lowell Lenarz

COUNSEL FOR APPELLEE:

Richard William Bertelson, III

COUNSEL FOR AMICUS CURIAE,
KENTUCKY ASSOCIATION OF
MANUFACTURERS AND
KENTUCKY CHAMBER OF COMMERCE:

Mark Allen Loyd, Jr.
Bailey Roese
Stephanie Marie Bruns
Dentons Bingham Greenebaum LLP